**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | No. 06 C 586-all |
| **MICHAEL HARRIS, CHRIS BLITCH,** | ) | |
| **DEVARL WASHINGTON, MICHAEL** | ) | |
| **CARWELL,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

On August 3, 2007, a jury found defendants Michael Harris, Chris Blitch, Devarl Washington, and Michael Carwell guilty of (1) conspiracy to possess with intent to distribute cocaine in excess of five kilograms, in violation of 21 U.S.C. § 846; (2) attempt to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846; (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and (4) being felons in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). All defendants have moved for a judgment of acquittal, a new trial, or alternatively a mistrial. *See* FED. R. CRIM. P. 29, 31, 33. For the following reasons, the motions are denied.

I.

On or about the first week of July 2006, Special Agent David Gomez of the Bureau of Alcohol, Tobacco & Firearms ("ATF") met with

Jamison Moore, a confidential informant ("CI"), in order to prepare an undercover sting operation. Moore had become a CI after entering into a plea agreement with the Kane County State's Attorney's Office, which had charged him with "unlawful delivery of controlled substance" (a class X felony punishable by a six to thirty year sentence under 720 ILCS 570/401(a)(1)(A)). As part of the plea agreement, Moore agreed to (1) a sentence of 48 months probation, receiving a credit for the time already served in the Kane County Jail; (2) pay statutory assessments and other fines and costs; and (3) "perform whatever functions or assistance required by Aurora Police Department and the Kane County State's Attorney's Office which resulted in the arrest and charging *of TEN different individuals with Delivery or Possession with intent to deliver controlled substances or cannabis*." (Moore Plea Agreement at ¶ 2.A) (emphasis in original). The plea agreement also provides that "*[e]ach case must involve a class X amount of cannabis or controlled substance by weight*. The Defendant [Moore] will not be a transactional witness in any of the cases that are ultimately charged as felony drug offenses, <u>unless</u> specifically authorized by a Kane County, Illinois, Assistant State Attorney." (Id.) (emphasis in original).

Agent Gomez and Moore came up with a cover story for the sting operation. Agent Gomez (who was going by the name "Loquito") was going to tell defendants he had served time with Moore at a

2

penitentiary facility within the Illinois Department of Corrections. "Loquito" would claim to be a disgruntled drug courier for a large Mexican organization that was trafficking cocaine from Mexico to the United States. He was looking for accomplices to commit a robbery of the stash house where the cocaine was stored and was relying on Moore to put him in contact with potential accomplices.

On July 27, 2006, Agent Gomez met with Moore, defendant Washington, and Antoine Bell (an individual who was not charged in this case) and told them the cover story. The record at trial was silent as to how Moore specifically got in touch with Washington and/or Bell and procured their presence at the meeting. The recordings and transcripts of the recordings from that meeting indicate that Washington was told that Loquito would get a call about one hour prior to having to pick up the drugs and that he would drive to wherever he was instructed for the pick up. Once he was at the stash house, which was always changing locations, he would be greeted by a group of men who are drug workers. Loquito also claimed to have seen fifteen kilograms of cocaine at the stash house. Washington asked a series of questions about the stash house and agreed to meet again.

On August 8, 2006, another meeting took place between the same four individuals. This time two additional individuals, identified as "Ritz" and "Mike-Mike," were supposed to attend, but failed to

appear.  Mike-Mike is defendant Harris.  The four individuals discuss the deal again and agree to meet again at a later date. Again, the record is silent as to how Moore specifically got in touch with Harris and his representations to Harris prior to the meeting.

The next meeting took place on August 14, 2006.  This time all four defendants were present along with the CI and the undercover agent.  Agent Gomez re-told the cover story and described the stash house.  Defendant Carwell asked about the number of people in the house and defendant Harris suggested "robbing" Agent Gomez as he leaves the house with five kilos of cocaine.  However, this suggestion was rejected in order to obtain fifteen kilos of cocaine, not just the five kilos that Loquito says he would be transporting.  There were also discussions about guns.

The next day, Agent Gomez and all four defendants reconvened. Specifically, Agent Gomez and Moore met at a McDonald's restaurant parking lot and called defendants.  Defendant Blitch drove his car to meet them and Harris was in the car with him.  Agent Gomez, still as Loquito, tried to get them in the van with him, but they refused and insisted on remaining in their car.  A few minutes later, defendants Washington and Carwell arrived and got in the van with Agent Gomez.  Agent Gomez told them he was going to drive them to a storage facility where they would eventually store and split the drugs, and to show them where to enter and leave the car after

the raid.  Both cars drove to the storage facility.  Upon arriving at the storage facility's gated entrance, Agent Gomez entered the code for the gate and started driving past the gate, Blitch and Harris refused to follow him past the gate.  Instead, Blitch and Harris backed their car outside of the gate and waited.  Once past the gate, Agent Gomez and Moore exited the van and ATF agents arrested Washington and Carwell.  Outside the gate, ATF agents and police blocked Blitch's car and arrested Blitch and Harris.  Each of the defendants had guns on his person or within his reach at the time of the arrest.  Washington also had a ski mask, duct tape, and twine.  Carwell also had baseball batting gloves on.  A fifth gun was found in the van.

The first trial in this case began on July 23, 2007. Representing the government at trial were Assistant United States Attorney ("AUSA") Patrick C. Pope and Kane County State's Attorney (acting as a "special AUSA") Jody Gleason.  Prior to trial, at the pre-trial conference, defense counsel for all defendants sought to contact Moore.  The government agreed to serve Moore with a subpoena for trial and offered to have a telephone conference with Moore and defense counsel on July 17, 2007.  Moore was not available for the telephone conference and failed to appear on the first day of trial as required by the subpoena.  On July 24, this court issued a bench warrant for Jamison Moore, for failure to comply with the subpoena.  On July 25, the first trial resulted in

a mistrial being declared as a result of statements and conduct by some of the jurors.

The second trial in this case began on July 26, 2007. Moore never appeared nor was located by the government for the second trial. Jury deliberations began on August 3, 2007. The jury indicated it had reached its verdict the same day - guilty as to all defendants on all counts. After the defense requested the jurors be individually polled in open court, one juror denied this was her verdict, and the jury was instructed by the court to resume its deliberations as it had not reached a unanimous verdict. None of defense counsel objected or moved for a mistrial. After additional deliberations, the jury subsequently returned guilty verdicts on all counts.

Although AUSA Pope represented that the government was making efforts to locate Moore throughout the proceedings, he was never found during the trials. But on August 11, 2007, Moore was apprehended on two unrelated state court warrants: one for failure to appear/disorderly conduct and the other for retail theft. Moore had a cash bond of $329. Detectives Smaha and Woody, of the Belvidere Police Department, executed these warrants by going to Moore's last known address at 10:05 p.m., knocking on the door, and identifying themselves as police. Moore opened the door, expressed surprise as to the existence of a warrant, and was arrested at the scene without resistance. On August 13 and 14, the government

represented in open court that it would not prosecute Moore for contempt for failure to appear at trial pursuant to the subpoena requiring his attendance.

## II.

### A. Sufficiency of the Evidence for Counts I and II

All defendants argue there is insufficient evidence to sustain their convictions for conspiracy (count I) and attempted possession with intent to distribute in excess of five kilograms of cocaine (count II). In evaluating a sufficiency challenge, I must "'consider the evidence in the light most favorable to the government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.'" *United States v. Gougis*, 432 F.3d 735, 743-44 (7th Cir. 2005) (quoting *United States v. Jackson*, 177 F.3d 628, 630 (7th Cir. 1999)).

In order to establish a violation of 21 U.S.C. § 846, the government must prove 1) that the defendant acted with the intent to possess cocaine with intent to distribute and 2) that he engaged in conduct which constitutes a substantial step toward the commission of the offense. *United States v. Jean*, 25 F.3d 588, 596 (7th Cir. 1994) (citation omitted). Attempted possession of cocaine with intent to distribute is a specific intent crime; thus, intent is an element of the offense that the government must prove

7

beyond a reasonable doubt. *See United States v. Best*, 250 F.3d 1084, 1091 (7th Cir. 2001) (citations omitted). "A substantial step is something more than mere preparation, but less than the last act necessary before the actual commission of the substantive crime." *United States v. Barnes*, 230 F.3d 311, 315 (7th Cir. 2000). "A conspiracy under 21 U.S.C. § 846 requires that (1) two or more people agreed to commit an unlawful act and (2) the defendant knowingly and intentionally joined in the agreement. No overt act is required." *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001).

In this case, the government was required to show that all four defendants knowingly and intentionally joined in the agreement to commit the "unlawful act" — to knowingly and intentionally possess with intent to distribute mixtures containing cocaine. The government's evidence at trial consisted primarily of tape-recorded meetings of the defendants with the undercover agent and Moore, as well as the undercover agent's testimony, and testimony concerning the defendants' actions on the day of the arrest by other law enforcement at the scene. I examine the evidence against each defendant.

1. Washington

Washington met with Agent Gomez and the CI three times prior to the day of the arrest. At the first meeting, Washington asked about the number of people they would find in the stash house,

agreed to be secretive about the plan to rob the stash house, and was instructed to find four other people to work the plan. In the recordings, Washington discusses the way they should enter the stash house and how he would want more information on the layout of the house. Washington also states that if at some point the occupants of the house raise a gun to him, he is going to shoot them. At the second and third meetings, Washington continues to play an active role in discussions with Agent Gomez and suggests renting a car to commit the robbery. Washington also discusses on several occasions the quantity of drugs they expect to obtain from the robbery - fifteen kilos - and rejects a proposed robbery plan which would only lead them to recover five kilos. During his arrest, ATF Agent Timothy Wilson found a loaded .22 caliber revolver on Washington's person, as well as a black hooded sweatshirt, ski mask, ball of twine, and duct tape.

2. Carwell

Carwell's first meeting with Agent Gomez took place on August 14, 2006. In the recordings, Carwell says he wants to know everything about the people in the stash house, including the number of people in the house and the number of weapons. He also asks about the risk involved, *i.e.*, whether they could be killed. When the remaining defendants arrive, Carwell shares this information with them. Carwell expresses concern that if they enter the house for the robbery somebody may end up dead. Carwell

makes suggestions with respect to the amount of time that Agent Gomez should spend inside the house before the defendants enter to commit the robbery.  Carwell also adds that they need a driver, two cars, and discusses the location of the getaway car.  Carwell says he wants two cars in order to dispose of the weapons with one car and to have a separate getaway car.  Carwell also goes over the plan to wait until Agent Gomez exits the house before committing the robbery.  With respect to the drugs, when Carwell is alone with Agent Gomez and Moore, he talks about re-packaging the drugs after the robbery and about each participant getting "two and a half bricks apiece."

On the day of the arrest, both Carwell and Washington were tape-recorded making plans concerning the getaway car and the amount of drugs each participant is going to receive.  Agent Anton, who was among the arresting officers, also testified that at the time of the arrest he found one .25 caliber semiautomatic pistol with one round in the chamber and six rounds in the magazine in Carwell's front pocket.  Carwell was also wearing batting gloves. Agent Anton also found an additional handgun, a .380 caliber semiautomatic pistol, in the van where defendants Washington and Carwell were when they were arrested.  This gun was also loaded.

3.  Harris

Harris also engaged in discussions about the proposed robbery on August 14, 2006.  Harris suggests robbing Agent Gomez as he left

the stash house so that it would be harder for the drug dealers to figure out that Agent Gomez was their inside man.  His idea is rejected by Washington because that would limit the amount of cocaine they would recover to five kilograms, instead of the fifteen that Agent Gomez says is in the house.  In response to Carwell's concerns about transportation, Harris offers that he has his own transportation.  Harris and Blitch also respond to Agent Gomez's question about a possible scenario where the people in the house have a "MAC" (machine gun).  Harris offers that they have a MAC as well and that they are going to get a MAC.  He also asks Agent Gomez if he has pistols.  Harris also discusses the method by which they intend to enter the stash house in more detail, particularly the timing.  On the date of the arrest, Harris says he is not going past the gate into the storage facility because it is closed and that he is "waiting on the safe side."  At the time of the arrest, a revolver was found in Harris' waistband.

4.  Blitch

At the August 14 meeting, Blitch specifically says that they should enter the stash house as soon as Agent Gomez comes out. Blitch also responds to Agent Gomez's question about a possible scenario where the people in the house have a MAC.  Blitch offers that they have a MAC as well.  Blitch also responds to Agent Gomez's questions about where he is going to be when the robbery takes place.  He reassures the undercover agent that he will be out

of the house already and in his car by the time the robbery takes place.  On the day of the arrest, police found a firearm on the floor of the drivers' seat in the car which Blitch was driving. The officer testified he saw Blitch drop something on the floor of the car just prior to the arrest.  Blitch also had a ski mask.

All defendants argue the government failed to prove beyond a reasonable doubt that they had the specific intent to distribute cocaine.  At the outset, I must reject this argument with respect to defendant Carwell.  Carwell was tape-recorded specifically discussing his intention to repackage the cocaine after the robbery and sell it.  (*See* 8/14/06 Tr. at 68-77.)  In contrast, the evidence of specific intent against the remaining defendants is strictly circumstantial.  Circumstantial evidence can properly secure a conviction, *see United States v. Richardson*, 208 F.3d 626, 632 (7th Cir. 2000).

With respect to Washington, he was tape-recorded throughout the different meetings discussing the quantity of cocaine they sought to recover from the robbery, and in that context made two separate statements that are significant for purposes of this inquiry.  The first was in response to Moore's statement that each potential participant in the robbery stands to obtain three bricks of cocaine, Washington comments that "[if] you can't make [nothing] happen with that, then . . . anyway." (7/27/06 Tr. at 45.)  Moore agrees with Washington by saying "With three, with three birds

[referencing the brick of cocaine], hell, yeah." (Id.) This exchange took place at the July 27 meeting, where none of the other defendants were present. A reasonable interpretation of this statement (particularly in light of the use of the word "make") is that Washington intended to make money based on the quantity of cocaine. Washington's second set of relevant statements, which were made at the August 14 meeting, are consistent with this interpretation of this statement. There, Washington rejects Harris' suggestion to avoid robbing the house and only rob the undercover agent as he exited the house. Washington specifically rejects the idea because that would mean they only get five kilos of cocaine to split among all defendants. The separate statements are consistent with each other and, when taken in the best light to the prosecution, provide sufficient evidence of Washington's specific intent to distribute cocaine. Washington's own statements are inconsistent with the argument that he was contemplating using the cocaine strictly for personal use.

There is also sufficient evidence of Harris and Blitch's intent to distribute and join the conspiracy. Based on the tape-recorded conversations it is clear these defendants were aware of the large quantity of drugs that were at the stash house, that these large quantities of drugs are valuable and, therefore, likely to be protected by people with guns. These defendants also agreed to enter the stash house with guns, as opposed as robbing Loquito

as he exited, in order to obtain more drugs. These defendants also agreed to split the drugs among the co-conspirators, discussed the need to bring different kinds of weapons, and brought weapons with them. *See United States v. Garrett*, 903 F.2d 1105, 1113 n. 11 (7th Cir. 1990) (collecting cases where intent to distribute has been inferred based on the use of firearms). Accordingly, the motion for judgment of acquittal is also denied with respect to Harris and Blitch.[1]

Finally, to the extent the defendants argue there is insufficient evidence that a substantial step was taken, the record shows otherwise. There was ample evidence that the defendants took a substantial step toward robbing the stash house. Specifically, they brought weapons with them, gloves and/or ski masks and duct tape, met at the McDonald's parking lot as agreed, and got in the van with Agent Gomez and Moore in order to visit the storage facility where they were going to split the drugs. When this evidence is viewed collectively and in the best light to the prosecution, it is sufficient to sustain these convictions.

---

[1]Defendants Harris and Blitch also argue, based on their refusal to get into the undercover agent's van and to enter the storage facility, that they withdrew from a conspiracy. "[W]ithdrawal requires an affirmative act on the part of the conspirator. He must either confess to authorities, or 'communicate to each of his conspirators that he has abandoned the conspiracy and it goals.'" *United States v. Maloney*, 71 F.3d 645, 654-55 (7th Cir. 1995). Harris and Blitch's actions on the day of the arrest do not rise to the type of conduct necessary to establish that they withdrew from the conspiracy.

Accordingly, defendants' motions on this ground are denied.

### B. Sufficiency of the Evidence for Count III

Count III charged each defendant with violating 18 U.S.C. § 924(c)(1)(A). As already set forth, there is sufficient evidence to sustain the convictions of defendants with respect to counts I and II. In light of that and the evidence at trial concerning these defendants' possession of guns at the time of their arrest, there are no grounds on which to find there was insufficient evidence against the defendants on count III.

### C. Confidential Informant

All defendants move for judgment of acquittal and/or new trial based on the government's failure to secure the appearance of the confidential informant. Although the defendants make several arguments concerning the appropriate legal standard on this issue, it is clear that there is controlling Seventh Circuit precedent as set forth in *United States v. Pizarro*, 717 F.2d 336 (7th Cir. 1983). "When a defendant asserts a defense based on the alleged misconduct of a confidential government informant, he is entitled to receive reasonable cooperation from the government in securing the informant's appearance at trial." *Id.* at 343 (citing *United States v. Cansler*, 419 F.2d 952, 954 (7th Cir. 1969)).

### 1. Reasonableness of Government's Efforts

"[S]hould an informant disappear, the government bears the burden of demonstrating first that it did not cause the

disappearance, and second that it made a reasonable effort to locate the informant for trial." *Id*. After a hearing on this issue, I concluded that there was no evidence that the government caused the disappearance, but that the government did not make reasonable efforts to procure Moore's presence at trial.

At the hearing, it was established that Moore was served with the trial subpoena by ATF Agent Dave Balkema and Investigator Greg Spayth, of the Aurora Police Department, on July 14, 2007. Officer Spayth described Moore's demanor at the time of service:

> He was sort of upset, confused. I think his belief was that he probably wouldn't have to testify; so when I gave him the subpoena, he was confused why I was giving him that, he was a little upset because he thought I had gone back on what I had said prior to that. . . . [T]hat I didn't think he was going to have to testify. It was getting close to trial, and it seemed like we weren't going to be needing him for the trial.

(Tr. 3/21/08 at 12.) Also at the time of service, Officer Spayth told Moore "we didn't know if he was going to be needed for the trial or not, but we were serving a subpoena on him for the trial in the event that he was going to be needed for the trial." (Tr. 3/21/08 at 10.) Officer Spayth further told Moore that "AUSA . . . Patrick Pope wanted to speak with him on the phone the upcoming Tuesday [July 18] to discuss the potential that he needed to testify." (Id.) Agent Balkema then gave Moore money to make sure Moore would have enough minutes on his cellular telephone for the call. On July 18, the government called Moore on his cellular telephone (using "Direct Connect") and it showed Moore's phone was

"not available." (Id. at 14-15.) The government did not have any further contact with Moore until the trial was completed.

Officer Spayth testified that after July 18 and through July 25 his efforts to locate Moore consisted of "periodically I tried to chirp [call] him on his phone, but nothing ever went through" and the phone would indicate Moore's telephone was "unavailable." (Id. 23-24.) Officer Spayth testified that "on the 25th of July, the trial had started, and I learned that a warrant had been issued for his arrest for contempt of court. So at that point I began to start seriously looking for him at that point." (Id. at 24.) His personal efforts consisted of calling Moore's cellular telephone again and visiting Moore's last known Aurora addresses (neither of which was his last known address as Moore had been relocated by police from Aurora to Belvidere). Officer Spayth testified he made no contact with any individuals at these addresses, which included Moore's sister's apartment and Moore's grandfather's house. After the warrant was issued (but it is unclear if on the same day), Officer Spayth also informed the Aurora Police Department that a warrant had been issued for Moore by this court.

ATF Agent John Richardson was contacted by Agent Balkema for the purpose of locating Moore. His efforts consisted of contacting some local law enforcement agencies, including Deputy Mordt from the Boone County Sheriff's Department; going to the Rockford Police Department Metro Narcotics Unit to check if Moore had been arrested

in Winnebago County; and going to Moore's last known address, which was an apartment in Belvidere, on the date the warrant was issued (July 25) and two other occasions. Agent Richardson obtained Moore's last known address from Deputy Mordt. On the first visit to Moore's address, Agent Richardson entered the apartment building, knocked on Moore's door, and observed the building from his car for approximately 15 or 20 minutes. This visit took place approximately between 6:30 and 7 p.m. The following Monday, Agent Richardson again went to Moore's apartment and knocked on the door and observed the building from his car for a few minutes. This visit took place around 8:30 a.m. On his third visit, around August 1 or 2, Agent Richardson did not enter the building or knock on Moore's door; he instead parked his car "down the street [] for a few minutes." (Id. at 141.) This visit took place around 1 or 2 p.m. Agent Balkema, who also served as the case agent during trial, ran Moore's name through a law enforcement database on July 20, to see if Moore had been arrested. These were the extent of the ATF's efforts.

After being contacted by Agent Richardson, Deputy Mordt testified he "drove by" Moore's address and some of the places he had observed him "hanging out" on the street multiple times to see if he could find Moore. Deputy Mordt would drive by on his way to "go get gas." (Tr. 4/11/08 at 23.) Deputy Mordt also communicated to other law enforcement that Moore was wanted.

Deputy US Marshal Patel testified he received the warrant on July 25 from his supervisor. This was his second assignment executing warrants. After receiving this assignment, Deputy Patel ran a criminal history check of Moore on July 27 and attempted to contact AUSA Pope to get more information on the case. AUSA Pope did not return his call immediately, but on the following Monday he referred Deputy Patel to Officer Spayth. AUSA Pope did not inform Deputy Patel the trial was currently underway. On July 30, Deputy Patel spoke with Officer Spayth, who did not inform Deputy Patel of the trial dates and, yet, told him Moore would not be called as a witness in the case. On July 31, Deputy Patel contacted Belvidere Police Department for his booking information and photos. Deputy Patel also contacted US Marshal Reed at its Rockford office for assistance on August 1. Deputy Patel then faxed Deputy US Marshal Reed the pertinent information on the case. On the first page of the fax, Deputy Patel wrote: "Subpoena was issued to Moore to appear in court to testify (he was not going to be used to testify) by USDJ Bucklo." (Id. at 73.) On August 7, US Marshal Reed attempted to locate Moore. He visited several of his last known addresses, his last known work address, and spoke with neighbors and former co-workers. He was unable to locate Moore on that date. Nobody from the Marshal's office, or the government, ever entered the federal warrant into NCIC, the database that lists all warrants for an individual.

Moore testified with respect to his whereabouts. Consistent with his representations to the Court at the time of his arrest for the federal warrant, Moore explained he lost his cellular telephone the day prior to the telephone conference. He was not evading law enforcement, but working as a roofer in Belvidere (which is corroborated by Deputy Reed's testimony concerning his search for Moore). Moore testified he did not work regular 9-5 hours on this job. With respect to why he failed to comply with the subpoena, Moore explained

> [Officer Spayth] said it wasn't for sure [that he would be called as a witness], that he would contact me and let me know.
> . . .
> [Officer Spayth] handed me a subpoena and told me that I was supposed to be in court, but he didn't know for sure if I was needed to testify and that I would be getting a call to verify if I needed to come.

(Tr. 3/21/08 at 93-94.) Moore also testified that Officer Spayth had his residential telephone number and that he did not receive any telephone calls on that telephone during the period in question. He was also unaware that government agents had been trying to contact him in person. I found Moore's testimony credible.

When the evidence at the hearing is examined collectively, it establishes the federal authorities delegated responsibility both within their ranks as well to the local authorities, but that very little reasonable efforts were taken to locate Moore. The record is clear that not a single government agent or local law

enforcement officer called Moore's known residential telephone
number when attempting to locate him for trial or execute the bench
warrant. The government was aware his residence had a telephone.
The fact that Moore shared his residential telephone number with
all of the tenants at that address did not make it reasonable not
to call. Indeed, Officer Spayth specifically testified he tried
calling old telephone numbers for Moore, even though he knew Moore
was no longer using those particular telephones. The evidence also
established that the only government agent - Agent Richardson - *to
enter* Moore's building *during the time the trial was taking place*
and knock on his door, did so on two occasions on weekdays around
8:30 a.m. and 6:30 or 7 p.m, which is consistent with hours during
which Moore, and most other people, would have been at work or
commuting. "Driving by" the outside of the building where Moore
resided, on the way to get gas or otherwise, is not a reasonable
effort that could be expected to yield much information, much less
Moore's whereabouts - other than he was not standing in front of
his building at that moment. Although Agent Spayth testified he
was Moore's handler, he claimed he did not know of Moore's
employment or his girlfriend, and yet he was the person designated
to give the US Marshal service the pertinent information to
location Moore. US Marshal Reed was able to contact local law
enforcement and obtain this information quickly, but not until
after the trial had concluded. Finally, the fact that the US

Marshal Service was not informed of the trial dates, which would have underscored the urgency of the matter, is significant. The US Marshal Service received no information from the case agent, AUSA, or Officer Spayth concerning the dates of the trial. Moreover, Officer Spayth specifically told Deputy Patel that Moore was not to be called to testify at trial - which was, in fact, inconsistent with the defendants' requests at trial.[2] The government never even entered the warrant into NCIC. For those reasons, I do not find the government's efforts were reasonable.

## 2. Materiality

*Pizarro* requires a showing of materiality before a defendant's conviction is overturned based on the government's failure to produce a confidential informant for trial. It stated "absent some showing of intentional government misconduct, a defendant 'can establish no Sixth Amendment or Due Process Clause violation without making some plausible explanation of the assistance he would have received from the testimony of the missing witness.'" 717 F.3d at 345 (quoting *United States v. Valenzuela-Bernal*, 458

---

[2]Defendant Carwell advances the argument that Officer Spayth's failure to inform Deputy Patel of the dates of trial is evidence of intentional government misconduct. Carwell argues this omission was intended to affirmatively obstruct the Marshals' search. The government's lackluster efforts are certainly troubling, as was Officer Spayth's testimony, but when the evidence from the hearing is examined collectively, it does not compel a finding that the government's conduct rises to the level of intentional misconduct. The remaining defendants' motions arguing in favor of a finding of intentional misconduct are also denied.

U.S. 858, 871 (1982)) (alterations omitted). In *Valenzuela-Bernal*, the Supreme Court acknowledged that "the fact that neither [defendant] nor his attorney was afforded an opportunity to interview the deported witnesses to determine what favorable information they possessed . . . may support a relaxation of the specificity required in showing materiality" but did not abolish the requirement. 458 U.S. at 870.

In this case, the defense sought to question the CI about a number of subjects they claim would have proven material at trial. These included: (1) unrecorded, unmonitored conversations between the defendants and the CI; (2) the nature of the CI's agreement with the government; (3) whether certain defendants took a substantial step for purposes of the attempt charge (count II); (4) the defendants' intent and knowledge; and (5) the nature of each individual defendant's agreement, if any, solely with the CI.

Defendants have now been given the opportunity to question Moore on these subjects and they have not established that his testimony would have been material at trial. None of the questioning on these particular issues defeat the evidence at trial with respect to the remaining convictions. There is no evidence of entrapment or duress. There is no evidence that Moore somehow "tricked" the defendants into meeting at the McDonald's parking lot on the day of the arrest. There is no evidence that is inconsistent with the evidence at trial, concerning defendants'

state of mind, as set forth in the recordings and transcripts of the meetings prior to the time of arrest.

Defendants argue they would have been able to impeach Agent Gomez's testimony at trial, that he was unaware of Moore's motivation for involving the four defendants in the sting operation, based on Moore's testimony at the hearing. The biggest problem with this argument is that defendants could have made the same inquiry of Agent Gomez at trial based on the plea agreement - which the government represents was disclosed to defendants. In other words, Moore's presence at trial was not required in order to introduce the existence of the plea agreement. Moreover, defendants' argument is based on speculation. There is nothing on the record to indicate that Agent Gomez was, in fact, lying. Agent Gomez's testimony does not address whether he was familiar with the terms of the plea agreement. To conclude otherwise would be speculative. *See Pizarro*, 717 F.2d at 345 (citing *United States v. Perlman*, 430 F.2d 22, 26 (7th Cir. 1970)) ("Without something more than [defendant's] own speculation, we can only conclude that [the informant's] testimony at the second trial would have remained adverse to [the] defense.).

### D. The Verdict

The circumstances preceding the jury's final verdict were unusual. Although the jury indicated it had reached a unanimous verdict, when polled at defendants' requests, one juror denied it

was her verdict.  The jury was then instructed to continue deliberating because they had not, in fact, reached a unanimous verdict.  The jury later returned a unanimous verdict.

The defendants argue they are entitled to a new trial on the grounds that the verdict as not unanimous and that this court erred by stating to the jury at the time that the individual juror indicated the first verdict was not her own

> I am going to ask you people go back to the jury room. At one point you had indicated you wanted to leave today, but I'll let you people decide what you want to do and deliberate further.  We do not have a unanimous verdict, so that's all.

(Trial Tr. at 1104.)  This statement was made in reference to a note the jurors had sent earlier which had indicated that they wanted to leave by 3:30 p.m. (Trial. Tr. at 1099.)

Neither of defendants' arguments have merit.  First, under FED. R. CRIM. P. 31(d), "[a]fter a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually.  If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury."  Although specifically asked by the court as to how they wished to proceed after the jury was sent to continue deliberations in light of the polling results, the defense agreed with the court to continue deliberations.  The defense did not move for a mistrial. Therefore, instructing the jurors to continue deliberations was not

improper. Second, with respect to the court's reference to the previous jury note concerning scheduling, when this is examined in the context of the proceedings, there is no basis on which to conclude that this somehow affected the jury's verdict. It was clear that it was for the jury to decide how long they wanted to continue deliberating at that point. Indeed, the jury was polled and instructed to continue deliberating around 3:30 pm, which was the time they had sought to leave for the day in their previous note. Moreover, later during the proceedings on that day, the defense expressed concern that the jury might think they had to stay to deliberate into the evening and they were reminded that the jury had been informed they could decide when to go home. (Trial Tr. at 1109.) No objection was made; to the contrary, this seemed to address the defenses' concern.

Defendants also rely on a subsequent note from the jury in arguing the final verdict was not unanimous. That note provided

> We have a debated situation with a decision on two of the counts. They are as follows: One, Count 2; two, Count 3. May we have a little direction if that is possible? What options do we have. Can a juror be asked to be dismissed in a proceeding?

(Trial Tr. at 1106, 1108-09.) As requested by the defense, the court responded to the jury: "Please continue to deliberate. A juror may not be dismissed." There was no objection.

In light of the absence of any objection by defendants at trial, in addition to the fact that all twelve jurors reached a

unanimous verdict and were polled again to confirm, there is no indication that the verdict was improperly reached. The same individual juror was polled in open court in the same manner as she was the first time and stated it was her verdict. The fact that she was willing to speak out in open court to indicate the first verdict was not her own is indicative of her strength and resolve. As a result, her confirmation during the polling for the final verdict is significant and weighs heavily against defendants' position. Accordingly, the motions on this ground are denied.

### E. Prosecutorial Misconduct

Defendants argue they are entitled to a new trial because the government's rebuttal closing argument was improper and constituted prosecutorial misconduct. Under *Darden v. Wainwright*, courts consider six factors in determining whether the prosecutor's misconduct resulted in an unfair trial: (1) the nature and seriousness of the prosecutorial misconduct; (2) whether the remarks implicate specific rights of the accused; (3) whether the defense invited the response; (4) the trial court's instructions; (5) the defendant's opportunity to rebut; and (6) the weight of the evidence against the defendant. 477 U.S. 168, 181-83 (1986); *Hough v. Anderson*, 272 F.3d 878, 903, n. 11 (7th Cir. 2001) (quoting *United States v. Durham*, 211 F.3d 437, 442 (7th Cir. 2000)).

Defendants argue that the government improperly argued that every action undertaken by the defendants on the day of the arrest

constituted a substantial step. Specifically, the government argued

> The substantial step, everything they did on August 15th is a substantial step towards the possession with the intent to distribute. Getting the cars, driving to McDonald's, bringing the guns, bringing the mask, bringing the duct tape, the twine, every one of those is a substantial step. Staying there, driving up to the storage facility, waiting on that call. They are ready to go. Every one of those is a substantial step.

(Trial Tr. at 1047.) Defendants also argue that the government improperly argued to the jury that the intent to distribute could be shown through the defendants' purported agreement to distribute the cocaine amongst themselves. Specifically, the government argued

> Everybody is expecting about two and a half kilos. When they divide that 15 kilos of cocaine up among themselves, they distribute it, okay. You break it down into smaller amounts, pass it around to each other, you process the whole thing, and then you distribute it to each other. That's enough.

(Trial Tr. at 1038-39.)

As a matter of law, the prosecution's statements with respect to a substantial step fall in somewhat of a gray area. Although the statement "[e]very one of those is a substantial step," in reference to distinct acts by the defendants is problematic, when viewed in context, it does not affirmatively misstate the law or invite the jury to make an improper determination. "A substantial step is something more than mere preparation, but less than the last act necessary before the actual commission of the substantive

crime." *Barnes*, 230 F.3d at 315 (citation omitted). "An act must be of such a nature that a reasonable observer viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute. *Id.* Because the government's statement provides that the distinct acts identified can be viewed commutatively, it is not *per se* improper. With respect to the second statement concerning distribution, although defendants argue this is a misstatement of the law, they actually fail to cite any law in support of their argument. Distribution consists of the "transfer of possession from one person to another." *United States v. Bailey*, 510 F.3d 726, 735 (2007).[3] Defendants provide no legal basis on which to conclude the government's closing argument was a misstatement of the law and, accordingly, have failed to establish that the first factor of the *Darden* framework favors them.

F. Impartial Jury

Harris argues that the jury was tainted during jury selection because some of the potential jurors expressed concern about their personal security during the jury selection process. The potential

---

[3]At least in some circumstances, transfer among conspirators is sufficient to constitute "distribution." *E.g., United States v. Poole,* 600 F.2d 547, 561 (5th Cir. 1982). *See also, United States v. Brunty*, 701 F.2d 1375, 1381 (11th Cir. 1983) (collecting cases); *United States v. Ocampo-Guarin,* 968 F.2d 1406, 1410 (1st Cir. 1992). Regardless, in this case defendants benefitted from a more limited definition since I instructed the jury that they would have to find an intent to distribute beyond the conspirators in order to convict the defendants.

jurors who were found to have improperly discussed the case or to be preoccupied about their personal security to the extent that they could not be impartial were excused. All potential jurors were instructed by the court that they should not be concerned about their personal security and were admonished not to discuss the case. No subsequent developments, either during jury selection or the trial, suggest the jury disregarded the court's preliminary instructions. Accordingly, the motion on this ground is denied.

III.

For the foregoing reasons, the defendants' motions are denied.


**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: August 6, 2008